# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

THE WASHINGTON HOUSE )
CONDOMINUM ASSOCIATION )
OF UNIT OWNERS, On Its Own )
Behalf and On Behalf of Multiple )
Unit Owners, and WILLIAM E. )
MONTGOMERY, and TAMARA )
A. MONTGOMERY, Individually, )
 )
      Plaintiffs, )
      v. ) C.A. No. N15C-01-108 WCC CCLD
 )
DAYSTAR SILLS, INC., a )
Delaware Corporation, DAVID N. )
SILLS, IV, WASHINGTON )
HOUSE PARTNERS, LLC, a )
Delaware Limited Liability )
Company, ARCHITECTURAL )
CONCEPTS, P.C., a Pennsylvania )
Corporation, AVALON )
ASSOCIATES OF MARYLAND, )
INC., a Maryland Corporation, and )
ENVIRONMENTAL )
STONEWORKS, LLC, a Delaware )
Limited Liability Company, )
 )
      Defendants. )

Submitted:  March 10, 2017
Decided: August 8, 2017

**Environmental Materials, LLC d/b/a Environmental Stoneworks' Motion to Dismiss Daystar Sills, Inc.'s Crossclaims – DENIED**

**Daystar Sills, Inc. and David N. Sills, IV's Motion for Summary Judgment – DENIED**

**David N. Sills, IV's Motion for Summary Judgment – DENIED**

**Architectural Concepts, P.C.'s Motion for Summary Judgment –DENIED**

**Washington House Partners, LLC's Motion to Amend Crossclaim – GRANTED**

**MEMORANDUM OPINION**

Elizabeth Wilburn Joyce, Esquire, Seton C. Mangine, Esquire, Pinckney, Weidinger, Urban & Joyce LLC, 3711 Kennett Pike, Suite 210, Greenville, DE 19807. Attorneys for Plaintiffs.

Victoria K. Petrone, Esquire, George T. Lees III, Esquire, Logan & Petrone, LLC, One Corporate Commons, 100 W. Commons Blvd., Suite 435, New Castle, DE 19720. Attorneys for Defendants Daystar Sills, Inc. and David N. Sills, IV.

Roger D. Landon, Esquire, Lauren A. Cirrinicione, Esquire, Murphy & Landon, 1011 Centre Road, # 210, Wilmington, DE 19805. Attorneys for Defendants David N. Sills, IV and Washington House Partners, LLC.

Patrick M. McGrory, Esquire, Tighe & Cottrell, P.A., 704 N. King Street, Suite 500, P.O. Box 1031, Wilmington, DE 19899. Attorney for Defendant Architectural Concepts, P.C.

David L. Baumberger, Esquire, Chrissinger & Baumberger, Three Mill Road, Suite 301, Wilmington, DE 19806. Attorney for Defendant Avalon Associates of Maryland, Inc.

Gaston Loomis, Esquire, Delany McBride, P.C., 1000 N. West Street, Suite 1200, Wilmington, DE 19801. Attorney for Defendant Environmental Stoneworks, LLC.

**CARPENTER, J.**

## I.     FACTUAL & PROCEDURAL BACKGROUND

This litigation arises from the allegedly defective design and construction of The Washington House Condominium ("Washington House" or "the Condominium"). Located on Main Street in Newark, Delaware, the Washington House contains fifty-four residential units and four commercial units, two of which are owned by the University of Delaware.[1]

Construction of the Condominium concluded in the fall of 2008. It was not long before the Washington House was plagued by water infiltration issues, among other problems. The Condominium was eventually discovered to contain systemic design and construction defects, which resulted in, most notably, the failure and progressive detachment of the building's exterior masonry veneer. On January 14, 2015, Washington House Condominium Association ("WHCA"), an unincorporated association of unit owners, and individual unit owners William and Tamara Montgomery (collectively, "Plaintiffs") filed the instant action against Defendants, each of whom allegedly played a role in the defective design, construction, and repair of the Condominium.

---

[1] Compl. ¶ 1.

## A. The Washington House Project

Defendant Daystar Sills, Inc. ("Daystar") is a Delaware corporation engaged in the business of constructing and developing commercial and residential buildings. Defendant David N. Sills, IV ("Mr. Sills") is Daystar's President and sole stockholder. Mr. Sills also co-owns and manages Defendant Washington House Partners, LLC ("WHP").[2] Mr. Sills formed WHP in 2006 for purposes of purchasing the property upon which the Washington House was built.[3]

Once WHP acquired the land for the Washington House project, it hired Daystar, as "Contractor," to build the Condominium.[4] In this regard, Daystar would be responsible for reviewing architectural plans, soliciting bids, hiring subcontractors, and scheduling, producing, and invoicing work for the project, among other things.[5] In its contract with WHP, Daystar promised to "direct and supervise" the construction of the Washington House "using [its] best skill and attention."[6]

Daystar hired Defendants Architectural Concepts, P.C ("AC"), Avalon Associates of Maryland, Inc. ("Avalon"), and Environmental Stoneworks, LLC

---

[2] Mr. Sills is a 50% member of WHP. Pls.' Ex. 606 § 1.7.

[3] Compl. ¶ 22.

[4] Daystar Sills, Inc. and David N. Sills, IV's [hereinafter Daystar Defs.] Mot. for Summ. J., Ex. A. The WHP-Daystar contract reflected that the Condominium was to be completed within 720 days of the commencement of construction.

[5] *See* Deposition of David N. Sills, IV [hereinafter Sills Dep.] (June 30, 2016) at 37:13-23.

[6] *See* Daystar Defs.' Mot. for Summ. J., Ex. A.

("ESW") in connection with the project. AC, an architectural firm, was retained in 2006 to prepare the design plans and specifications used to construct the Condominium. Avalon was hired as a project manager in February 2007. Avalon's project management obligations were fulfilled by the company's sole owner, Roger Edward Leonard, Jr. ("Mr. Leonard"). Sometime in 2008, Mr. Leonard was hired by Daystar directly, such that he began performing his management services as a Daystar employee. Finally, Daystar subcontracted with ESW to install the Condominium's exterior masonry veneer.

AC's original design plans for the Washington House specified that the building would be constructed with a "full brick" exterior. However, sometime in late spring/early summer 2007, Mr. Sills approved the decision to use "thin brick" veneer in place of the full brick for cost and time-saving purposes. The design change was apparently discussed at a May 2007 meeting among AC and Daystar representatives. [7] AC representatives expressed concerns about using thin brick for a project like the Washington House. Daystar nevertheless sought to move forward with the thin brick system and AC modified its plans accordingly. AC's revised plans, dated June 13, 2007, were approved by the city on July 9, 2007.

---

[7] Pls.' Ex. 624.

Mr. Sills and Leonard collaborated in selecting the manufacturer of the thin brick product ultimately used on the Condominium: non-party Marion Ceramics, Inc. This decision was apparently made despite the fact that, at the time, Marion Ceramics did not provide manufacturer installation instructions for their thin brick product. Pursuant to the August 20, 2007 subcontract, ESW was hired by Daystar to install the product on the building's exterior façade.[8]

On February 22, 2008, Michael Cihlar ("Mr. Cihlar") of AC emailed Mr. Leonard. The email indicates that AC "continually expressed [its] concern" to Daystar "regarding the appropriateness of exterior thin brick on a building subject to freeze/thaw in the North East climate."[9] Mr. Cihlar explained that, despite further research, AC could not locate one "organization, institute, agency, or company that will stand behind a thin brick assembly as a whole in this climate."[10] As a result, AC informed Daystar that it was "proceeding at [its] own risk" and advised that Daystar continue its due diligence and carefully monitor the installation of the veneer to ensure "the ability of movement, flashing, and drainage of the system."[11]

---

[8] Pls.' Ex. 653.
[9] Pls.' Ex. 659.
[10] *Id.*
[11] *Id.*

Mr. Leonard forwarded Mr. Cihlar's email to Mr. Sills, and also passed on AC's concerns to ESW. ESW assured Daystar that the exterior veneer would be installed according to ESW's standards and that ESW would have the manufacturer certify the installation.[12] It does not appear ESW ever retrieved any certification from the manufacturer about ESW's internal installation procedures. Nevertheless, Mr. Sills allegedly insisted construction move forward as planned in order to keep the project on schedule.

## B. The Declaration & Code of Regulations

On October 17, 2008, with construction nearly completed, Mr. Sills signed and recorded a Declaration Establishing a Plan for Condominium Ownership ("Declaration") on WHP's behalf pursuant to Delaware's Unit Property Act.[13] WHP also adopted and recorded a Code of Regulations ("the Regulations") governing matters such as the use, occupancy, management, and operation of the Condominium.[14] The Regulations established the WHCA, through which the unit owners would be responsible for "administering the Condominium."[15] Although "the affairs of the Condominium" would ultimately be controlled by "the Council,"

---

[12] Pls.' Ex. 661A.
[13] *See* 25 *Del. C*. §§ 2201-2246.
[14] Daystar Defs.' Mot. for Summ. J., Ex. G [hereinafter COR].
[15] COR at 2.

which possesses "all of the powers and duties necessary for the administration of…the Condominium."[16]

WHP, as Declarant for the Condominium, had the power to designate the members of the Council during the "Developer Control Period."[17]  The Developer Control Period would last until 80% of the Condominium's residential units were purchased from WHP, at which point the power to elect Council members would be turned over to the unit owners.  WHP named Mr. Sills the original and sole member of the Council during the Developer Control Period.[18] Control and operation of the Washington House would not be fully turned over to a unit-owner-elected Council until January 19, 2012, as discussed further *infra* (the "Turnover").[19]

Once the Condominium's governing documents were filed and recorded, WHP began selling units at the Washington House, with the first unit purchased on October 23, 2008.  More than half of the residential units would be sold within the Condominium's first year.

---

[16] *Id*. at 2, 5.
[17] *Id*. at 35.
[18] Compl. ¶ 22.
[19]*Id*. ¶ 33. According to Plaintiffs, prior to this time, "all decisions regarding oversight, inspection, evaluation, maintenance and repair of the condominium common elements, and all decisions regarding the dissemination of information regarding the same, were made by David Sills." *Id*. ¶ 37.

## C. The ESW-Daystar Action

Daystar was ultimately dissatisfied with ESW's work on the Washington House's exterior. In an email dated November 14, 2008, Mr. Sills told ESW that the work "look[ed] horrible" and characterized his predicament as a "no win" situation:

> I have a poor job that has been torn down, re-done, and is still a poor job. If I re-do it again it affects people that have moved into the building and it affects sales and marketing. Do you want me to put a value on that? If I let you do it I have no confidence you could actually make it look good and the cost to the project would exceed any monies you think you are due. If I do nothing than it looks…bad. [20]

Having not been paid for its services, ESW filed a mechanics' lien action against Daystar and WHP on January 30, 2009. Washington House unit owners were notified in February of 2009 that Daystar was "involved in a payment dispute with the subcontractor that installed the stone and brick work on the exterior of the building" and was "actively defending the claim through its attorneys."[21] The letter, signed by Mr. Sills, assured the owners that no action on their behalf was necessary and that Daystar would "indemnify all homeowners and the condominium from the proceeding."[22]

---

[20] Pls.' Ex. 686.

[21] Daystar Defs.' Mot. for Summ. J., Ex. I.

[22] *Id*.

On April 9, 2009, Daystar filed a counterclaim against ESW for breach of contract, breaches of express and implied warranties, and negligence. Daystar claimed the cast stone veneer ESW installed was "uneven, unsightly," and unacceptable.[23] Daystar alleged that the veneer appeared "to be rolling and/or lumpy," exhibited "uneven joints," was missing caulk and bricks, contained inconsistent brick patterns and joints, and was otherwise deficient. [24]

The dispute ultimately went to arbitration.[25] Daystar retained experts to evaluate the Condominium's exterior,[26] and cited to their reports its arbitration submissions. In its Closing Arbitration Brief, submitted December 6, 2011, Daystar claimed $1.4 million in damages as a result of ESW's failure to "install flashing and a weep system," as required under the Subcontract, and "to correct deficiencies in its work," and emphasized the recommendation of its expert that the veneer be entirely removed and replaced.[27]

The Arbitrator issued an Order awarding Daystar $400,000.00 on January 6, 2012.[28] The only information the unit owners received about the ESW-Daystar Action was that contained in the February 2009 notice letter. While Mr. Sills' letter indicated Daystar was actively defending a subcontractor's claim for

---

[23] Pls.' Ex. 696A.
[24] *Id.*
[25] Pls.' Ex. 733 (Arbitration Agreement entered November 16, 2011).
[26] Pls.' Exs. 717, 1005.
[27] Pls.' Ex. 1005.
[28] The judgment against ESW was satisfied on March 2, 2012.

payment, the unit owners were not aware of Daystar's negligence counterclaim, the expert reports, or the outcome of the 2012 Arbitration.

### D. Issues Experienced by Washington House Unit Owners

The record reflects that, beginning in 2009, unit owners had experienced various water leak issues.[29] These issues were often noted at meetings of the Washington House unit owners ("Owners' Forum").[30] Unit owners would inform Daystar about any issues, and Daystar employees would undertake all repairs.[31] Daystar fixed water intrusion problems occurring in individual units, and throughout the Condominium.[32] Daystar repeatedly assured the unit owners it would remedy all of the leaks. Accordingly, the owners perceived the leaks as minor "punch list" or maintenance items.[33]

In 2010, the unit owners began discussing the Turnover and establishment of an owner-controlled Council.[34] One of the unit owners' "primary concerns" was having the building inspected. The purpose of the inspection was apparently to identify: (1) "items that do not meet code (if any)" to address prior to the Turnover and (2) "items that homeowners need to be aware of so that they can be addressed

---

[29] Chase Aff. ¶ 4; Daystar Defs.' Mot. for Summ. J., Exs. M, T.
[30] Daystar Defs.' Mot. for Summ. J., Ex. O at 5.
[31] *Id.*, Exs. M, T.
[32] Chase Aff. ¶ 5 (claiming Daystar "remedied the leak" in Chase's unit). Daystar representatives, including Sills, apparently "repeatedly promised" that all leaks would be remedied. *Id.* ¶ 6.
[33] *Id.* ¶ 7.
[34] Daystar Defs.' Mot. for Summ. J., Ex. J.

in future years and budgeted based on priority of need and funds available at the time."[35]  Unit owner Pamela Bobbs ("Ms. Bobbs") obtained a proposal from Alpha Engineering, Inc. ("Alpha") to conduct the inspection.  The inspection would be delayed, however, as, at the time, WHP and Mr. Sills controlled the Council, as well as WHCA's records and funds. Under these circumstances, the unit owners felt "it did not seem necessary to obtain a building inspection from a third party until the transition to an owner-elected Council."[36]

In 2010 and 2011, the owners continued to discuss the leaking issues. Unit owner John Piper experienced water leak issues almost immediately upon moving into the Washington House in 2009, and at the October 2010 Owners' Forum, residents were advised to "watch for similar problems."[37] At the January 2011 Owners' Forum, unit owners noted "property damage" concerns, including "sections of the garage ceiling fire retardant crumbling…related to larger water leak issues" and "unresolved leak problems."  Owners with outstanding problems were advised to write to Mr. Sills directly.[38]  All issues reported were recorded in a consolidated spreadsheet, which the unit owners maintained for purposes of

---

[35] *Id*., Ex. L (April 2010 meeting summary).
[36] Chase Aff. ¶ 8.
[37] Daystar Defs.' Mot. for Summ. J., Exs. M, N, O.
[38] *Id*., Ex. Q at 3.

"tracking the issues."[39] At the August 2011 meeting, the unit owners discussed water leaks in the foyer and stairwells and noted that "nothing on the building issues list seems to have been done."[40] As of October 2011, there had been "no action regarding the leaks."

In November 2011, the owners revisited their plan to have the building inspected. According to the meeting summary, at that time, there was "nothing in the budget to cover the cost of the building inspection." Attendees agreed that, pending Alpha's confirmation, the inspection would be delayed until funds were available but that it would be "prudent" to ensure the inspection was accomplished before Mr. Sills was "out of the picture."[41] The November 2011 meeting summary also briefly notes that "[s]ome of the building stone work need[ed] to be repaired" and Mr. Persak indicated that this issue was on "the list."[42] In December 2011, Mr. Sills assured the owners he would review their list of issues throughout the building and "address all of them."[43]

The Turnover took place on January 19, 2012 and a unit owner- elected Council assumed control of the Condominium. Initially, Mr. Sills refused to

---

[39] *Id*. Indeed, at the February 17, 2011 meeting, owners were reminded to register any issues experienced in their units with unit owner Bob Persak so that their "composite list" remained "up to date" and "in an effort to identify possible 'cross-unit' problems." *Id*., Ex. S at 1.
[40] *Id*., Ex. X at 1.
[41] *Id*., Ex. Z at 2.
[42] *Id*. at 3.
[43] *Id*., Ex. BB.

"recognize" the Turnover and relinquish control of the Condominium's financial records and bank accounts to the owner-elected Council. Upon threat of legal action, WHP and Mr. Sills turned over the requested information and authority in March 2012.

On April 24, 2012, Mr. Persak, as Vice President of the Council, wrote to Mr. Sills on WHCA's behalf to notify him of "apparent defects related to the construction of the Washington House" and the Council's belief that Mr. Sills, as the developer of the Condominium, was "legally responsible for the correction of the[] problems."[44] Mr. Persak attached a "summary report" based on a survey of unit owners regarding the "water incursion problems."[45]

### E. Inspections of the Condominium

Alpha's inspection of the Washington House took place on May 29, 2012. Alpha inspected only the Condominium's common areas, including the roof, exterior, corridors, elevators, etc. Alpha observed the exterior of the building to assess "the general condition of the foundation and super structure."[46] The walls and foundation were also inspected "to determine the general condition and to identify any major structural deficiencies that require costly repair."[47]

---

[44] *Id.*, Ex. DD.
[45] *Id.*
[46] *Id.*, Ex. EE at 2.
[47] *Id.*

Concerning the brick and stone veneer, Alpha's report provides that "[a]part from a missing stone and broken light lens, the exterior stone and brick appear in good condition."[48] However, upon "close examination," Alpha observed "minor cracks." Alpha also noted "very obvious" separation between the sundeck supports "likely due to differential settlement," which it advised "should be watched for further advancement." Alpha recommended corrective measures with respect to the exterior rainwater management, including adding gutters to the balconies and providing a catch basin.[49] Alpha also suggested further investigation of a leak in the deck above the parking garage in order to determine the appropriate repair.[50]

In January 2014, the Council engaged a new property manager for the Condominium: Aspen Property Management, Inc. ("Aspen"). Aspen hired Cogent Building Diagnostics ("Cogent") to conduct a more thorough evaluation of the Washington House in August 2014. Cogent's inspection apparently revealed serious and systemic construction defects at the Condominium.[51] According to the Complaint, the building's walls, brick exterior, roofing, and drainage systems, among other things, were negligently designed, constructed, installed, and/or

---

[48] *Id*. at 3.
[49] *Id*. at 3, 6.
[50] *Id*. at 6.
[51] Pls.' Answ. Br. in Opp'n to Daystar Defs.' Mot. for Summ. J. at 12.

repaired.[52] With regard to the walls and exterior veneer, the alleged defects

included:

> a. Improper and insufficient attachment of the metal lath base under exterior brick veneer using non-code-complaint nails pneumatically driven into non-structural sheathing…resulting in lath which lacks proper support and has separated from the building face causing overlying exterior masonry veneer to pull away…and…fall from the building…;
> b. Failure to install and/or improper installation of flashing and closures in exterior brick veneer walls,… resulting in water damage to the wall system and the occupied spaces of the building…;
> c. Improper sealing and blockage of…water drainage pathways above windows, thus exacerbating …water damage…[to] exterior walls;
> d. Failure to install and/or improper installation of sufficient expansion and control joints in exterior masonry veneer… causing… bricks on the outside of the building bulging and protruding away from the…veneer walls, fully detaching from the mortar base, and falling off the building;
> e. …[I]nstallation of…veneer mortar base with insufficient thickness…;
> f. Improper repairs to localized areas of brick veneer, wherein new lath was attached using unacceptable nailing methods and was not wired together with original lath to provide continuous wall support;
> g. Improper installation of adhered dry stack manufactured stone veneer…over concrete masonry unit ("CMU") walls without continuous coverage of the CMUs, without water barriers or waterproofing, and without control or expansion joints, causing water intrusion into the building, water damage to the stone veneer, and water pocketing, resulting in stones detaching from…the building following normal freeze-thaw cycles;
> …
> j. Failure to install control/expansion joints and other closures in parking garage concrete surfaces, resulting in extensive concrete cracking and damage to deck pans; [53]

---

[52] Compl. ¶¶ 68-69. These defects allegedly "have, in turn, resulted in real and personal property damage, including…water damage, water infiltration into walls and interior, occupied spaces, rusty and/or protruding drywall fasteners, water stains, warped hardwood flooring, water damaged carpet and furniture, premature deterioration, structural instability, and unsafe conditions[.]" *Id*. ¶ 70.
[53] *Id*. ¶ 68 (a)-(g), (j). *See also id.* ¶ 68 (l), (n), (p).

16

As for defects discovered in the Condominium's drainage systems and roofing, the

Complaint alleges:

> h. Failure to provide sufficient surface drainage or proper drainage provisions at roofs, balconies, patios and walkways, including inadequate surface slope, insufficient and/or misplaced drain locations, irregular surface definition, and unnecessary routing of roof run-off water onto these surfaces resulting in ponding of water, water intrusion under doors and walls into occupied spaces, and damage to interior spaces and mechanical equipment;
> i. Improper roof design and drainage and ice/snow fall protection that exposes passers-by to avoidable water exposure and potential harm;
> …
> m. Installation of heavily-sloped, raised metal…roofing far above ground level without any means of preventing ice and snow from falling a great distance…, thus posing a safety threat to people and property below;
> …
> o. Improper installation of membrane roofs, resulting in excessive water ponding…[and] premature roof leaks;
> …
> k. Failure to provide proper waterproofing and drainage provisions in the parking garage, resulting in drains backing up into the garage, water seeping through and around garage walls, leaking at drains, piping and unsealed penetrations through the concrete decking and damage to corrugated metal flooring supports;[54]

In September 2014, the City of Newark issued a Notice of Violation stating

that the exterior was constructed in violation of applicable building codes and the

---

[54] *Id*. ¶ 68 (h)-(i), (m), (o), (k). The Complaint also alleges other defects in the building's ventilation, insulation, and piping:
> q. Failure to install and/or provide insulation and ventilation in confined interstitial spaces between upper floor units and patio areas resulting in ceiling damage;
> r. Insufficient warm air distribution and/or inadequate insulation and air sealing, resulting in excessively cold indoor air temperatures and drafts during winter weather; and
> s. Installation of fire protection system water pipes adjacent to drywall rather than in the center of walls that has consequently resulted in the pipes being punctured causing water damage.
*See id.* ¶ 68 (q)-(s).

manufacturer's installation instructions.[55]  The Notice required the erection of

safety barriers and scaffolding around the entire building perimeter, in addition to

the removal, repair, and replacement of the exterior masonry veneer.[56]  The

WHCA was responsible for implementing these corrective measures at a

substantial cost to the unit owners.

### E. The Instant Litigation

Plaintiffs filed this litigation on January 14, 2015 seeking recovery of

damages including "costs of repair, costs of remediation, costs of temporary [and]

emergency protection for the public way, expectation damages, costs of

displacement, loss of use, loss of value, and other consequential damages."[57]  The

Complaint, as filed, asserted seven counts against Mr. Sills, Daystar, WHP, AC,

Avalon, and ESW.[58]

Plaintiffs have since voluntarily dismissed several counts of the Complaint,[59]

and just recently settled their dispute with Avalon.  Additionally, Plaintiffs' claims

against ESW were dismissed on October 28, 2015, pursuant to a ruling by this

Court granting ESW's Motion to Dismiss the Complaint.  The Court found that

---

[55] *Id.* ¶¶ 2, 72.
[56] *Id.* ¶ 67.
[57] *Id.* ¶ 92.
[58] The seven counts set forth in the Complaint, as filed, include: (I) Negligence; (II) Breach of Contract; (III) Breach of Express and Implied Warranty; (IV) Violation of Buyer Property Protection Act; (V) Breach of Duty in the Organization and Pre–Turnover Control of the Association; (VI) Negligent Repair; and (VII) Breach of Contract—Third Party Beneficiary
[59] Plaintiffs voluntarily dismissed Counts II, III, V, and VII in full.

Plaintiffs' claims against ESW were barred by *res judicata* as a result of the 2012 Arbitration and judgment.[60] Ultimately, what remains are Plaintiffs' claims for (1) negligence against AC, Daystar, Mr. Sills, and WHP; (2) negligent repair against Daystar, Mr. Sills, and WHP; and (3) violation of the Buyer Property Protection Act against WHP.

Crossclaims for contribution and/or indemnification have also been filed among the Defendants. At the time of the Court's October 2015 decision, there were Crossclaims pending against ESW. That ruling did not address the then-pending Crossclaims,[61] and additional claims were filed against ESW thereafter. Daystar filed its Answer to the Complaint and Crossclaims seeking "contribution and/or indemnification" and "contractual indemnification" from ESW on February 1, 2016.[62] AC cross-claimed for contribution from each co-Defendant and ESW on February 18, 2016. [63]

---

[60] *Washington House Condo. Ass'n of Unit Owners v. Daystar Sills, Inc.*, 2015 WL 6750046, at *2, 6-7 (Del. Super. Ct. Oct. 28, 2015). Motions to Dismiss the Complaint had also been filed on behalf of AC, Daystar, and Sills, which were argued before this Court in addition to ESW's Motion in July 2015. As reflected in its October 2015 opinion, the Court denied dismissal with regard to Plaintiffs' claims against Daystar, Sills, and AC.

[61] On March 4, 2015, Avalon filed an Answer to the Complaint along with Crossclaims against each co-Defendant for contribution and indemnification. On April 20, 2015, Mr. Sills and WHP filed their respective Answers and Crossclaims for contribution and/or indemnification from AC, Avalon, and ESW.

[62] Daystar Sills, Inc.'s Answ. and Crosscls. ¶¶ 151-71.

[63] While ESW did answer crossclaims of some of the Defendants, it does not appear to have ever answered those filed on behalf Avalon or AC.

19

There are five motions presently before the Court. ESW has moved to dismiss Daystar's Crossclaims. Three Motions for Summary Judgment have been filed on behalf of: (1) Defendants Daystar and Mr. Sills ("Daystar Defendants"); (2) Mr. Sills in his capacity as co-manager of WHP;[64] and (3) AC. Lastly, WHP has moved to amend its Crossclaim against ESW.[65] This is the Court's decision on those Motions.

## II. MOTION TO DISMISS CROSSCLAIMS

On April 21, 2016, ESW moved to dismiss Daystar's Crossclaims pursuant to Delaware Superior Court Civil Rule 12(b)(6).[66] Under Rule 12(b)(6), the Court may grant dismissal for "failure to state a claim upon which relief can be granted."[67] In deciding a motion to dismiss, the Court must view the record in a light most favorable to the non-moving party and accept as true the well-pleaded allegations of Daystar's Crossclaims.[68] The Court will grant a motion to dismiss

---

[64]Mr. Sills is represented by two different sets of counsel in this case. At argument, one of his attorneys explained this dual-representation: "Sills is being represented by two different insurance companies. One…is paying for his defense as to WHP, and then [the second] is paying for his defense as to Daystar." Hearing Tr. (Jan. 18, 2017) at 66: 12-23.

[65] Avalon had also moved for summary judgment; however, Plaintiffs have since settled with Avalon, thereby rendering its Motion moot.

[66] The parties argued their respective positions before the Court and, since settlement discussions and mediation was progressing, the Court reserved decision on ESW's Motion. While partially successful, the mediation has not resolved the instant dispute. Perhaps the determinations made by the Court will kick-start additional discussions among the parties.

[67] *See* Super. Ct. Civ. R. 12(b)(6).

[68] *See Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *3 (Del. Super. Ct. Apr. 16, 2014) (citing *Greenly v. Davis*, 486 A.2d 669, 670 (Del. 1984)); *Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544, 548 (Del. Ch. 2001) (citing *In re USACafes, L.P. Litig.*, 600 A.2d 43, 47 (Del. Ch. 1991)).

only where "it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the [claimant] would not be entitled to relief."[69]

ESW argues Daystar's Crossclaims must be dismissed as "procedurally defective" because they were filed *after* Plaintiffs' claims against ESW had already been dismissed. Additionally, ESW maintains Daystar's claims, together with "[a]ll cross claims against ESW," should be dismissed as barred by the doctrine of *res judicata*.[70] Finally, ESW requests the imposition of costs and attorneys' fees because "Daystar's Crossclaims, brought months after Plaintiffs' claims have been dismissed and years after an arbitration award between ESW and Daystar, [are] vexatious and unfairly burdensome."[71] Daystar, WHP, Mr. Sills, Avalon, and AC have each opposed ESW's Motion and Plaintiffs filed a limited objection.

The issue before the Court is essentially whether, given the 2012 Arbitration and the Court's previous ruling dismissing Plaintiffs' claims against ESW, the cross claims asserted against ESW for contribution and/or indemnification should remain part of the litigation. The Court will first address the procedural

---

[69] *See Furnari*, 2014 WL 1678419, at *3 (quoting *Clinton v. Enterprise Rent–A–Car Co.*, 977 A.2d 892, 895 (Del. 2009)).
[70] ESW's Omnibus Reply Br. ¶ 2.
[71] ESW's Mot. to Dismiss Crosscls. ¶¶ 3, 22.

appropriateness of Daystar's Cross Claim, before turning to ESW's *res judicata* contentions.

## A. Is Daystar's Claim Against ESW "Procedurally Defective?"

Daystar filed its Crossclaim on February 1, 2016, seeking contribution and/or indemnification from ESW pursuant to 10 *Del. C.* § 6301, *et seq.*, as well as contractual indemnification under a subcontract agreement between the parties.[72] In its pleading, Daystar acknowledged the Court's October 2015 decision and the curious procedural posture of the litigation, but asserted it was "required to assert its claim over against ESW" herein "for purposes of jury apportionment and application of the Uniform Contribution Among Tortfeasors Law…."[73] Otherwise, Daystar claims that it would "risk[] being precluded from having the jury allocate the percentage liability of ESW and the Court then reducing any subsequently entered verdict by the percentage liability allocated ESW, based upon the prior finding of liability and award of damages against ESW."[74] This is particularly critical to the other Defendants as ESW was the subcontractor who installed the faulty masonry work and, but for the Arbitration award and the Court's October 2015 ruling, would be in a position where significant liability could be found.

---

[72] Daystar Sills, Inc.'s Answ. and Crosscls. ¶¶ 151-71.
[73] *Id.* ¶¶ 156, 161.
[74] *Id.* ¶ 161.

Because Plaintiffs' claims against ESW were dismissed over three months before Daystar filed its Crossclaim against ESW, ESW argues Daystar's claims are "procedurally defective" and should be dismissed.[75] While ESW cites no rule or authority in support of this contention, the Court would think Superior Court Civil Rule 13(g) an appropriate starting point:

> Cross-Claim Against Coparty. A pleading may state as a cross-claim any claim by one party against a coparty arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein, or relating to any property that is the subject matter of the original action. Such cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant.[76]

Like its federal counterpart, Superior Court Civil Rule 13(g) allows a party to file cross claims against "co-parties."[77] In this regard, courts have held that "[a] cross-claim cannot be asserted against a party *who was dismissed from the action previous to the assertion of the cross-claim*."[78] That said, "dismissal of the original complaint as to one of the defendants named therein does not operate as a

---

[75] ESW Mot. to Dismiss Crosscls. ¶ 16.

[76] Del. Super. Ct. Civ. R. 13(g).

[77] *See id.;* Fed. R. Civ. P. 13. *See also Samoluk v. Basco, Inc.*, 1989 WL 135703, at *1–2 (Del. Super. Ct. Nov. 3, 1989) (acknowledging that federal cases interpreting Rule 13 are "helpful" because Delaware's version is "substantially the same as" the Rule 13 under the Federal Rules).

[78] *See Wake v. United States*, 89 F.3d 53, 63 (2nd Cir.1996) (emphasis added) (quoting *Glaziers & Glassworkers Union v. Newbridge Secs.*, 823 F. Supp. 1188, 1190 (E.D.Pa.1993)).

dismissal of a cross-claim filed against such defendant by a co-defendant."[79]  In

other words, where a Crossclaim is properly filed against a co-party, "[it] [will] not

cease to be so because the party to whom they were addressed subsequently ceased

to be a co-party."[80]

There is no dispute that the Crossclaims filed against ESW prior to the

October 28, 2015 dismissal ruling were "properly filed."  The Crossclaims of Mr.

Sills, and WHP against then-Defendant ESW fall squarely within Rule 13(g) and

were thus unaffected by the Court's subsequent ruling dismissing *Plaintiffs' claims*

against ESW.  At the time Daystar filed its Crossclaims, however, ESW remained

in the litigation solely as a Crossclaim-Defendant.[81] The issue then becomes

whether Daystar and ESW could be considered "co-parties" for purposes of Rule

13(g).

The term "co-party" is not defined in the Rules. As other courts have

recognized, the term would clearly seem to exclude non-parties and opposing

parties.[82]  Indeed, as Rule 13(g) governs claims made among co-parties, Rule 14

---

[79] *See Samoluk*, 1989 WL 135703, at *1–2 (citing *Aetna Ins. Co. v. Newton*, 398 F.2d 729, 734 (3d Cir. 1968)).

[80] *See id.* (quoting *Frommeyer v. L. & R. Const. Co*., 139 F. Supp. 579, 586 (D.N.J. 1956)).

[81] It seems this would be the case with regard to AC's Crossclaim as well. AC filed its Crossclaim for contribution against Defendants, including ESW, over two weeks *after* Daystar. Interestingly, ESW does not seem to challenge the procedural appropriateness of AC's claims.

[82] *See Luyster v. Textron, Inc.*, 266 F.R.D. 54, 57 (S.D.N.Y. 2010) ("It seems clear that a coparty against whom a party can cross-claim is neither a non-party nor a party it formally opposes….") (citing 6 Wright, Miller & Kane, Federal Practice & Procedure § 1431, at 233–35).

addresses claims of a defending party against non-parties and Rule 13(a) provides

for counterclaims against opposing parties.[83] While some courts have construed

"co-party" as referring to a party of "like status," others interpret the term more

broadly to include "any party that is not an opposing party."[84]

Ultimately, the Court finds the more broad interpretation of "co-party"

appropriate under the circumstances of this case. ESW was undoubtedly still a

party to the litigation at the time Daystar filed its Crossclaim and only from that

point forward could the two parties be classified as formally opposing one

another.[85] While the Court recognizes that Crossclaims are more commonly

invoked among co-Defendants or co-Third Party Defendants, ESW has not raised

---

[83] *See* Del. Super. Ct. Civ. R. 13(a) ("A pleading shall state as a counterclaim any claim which…the pleader has against any *opposing party….*") (emphasis added); Del. Super. Ct. Civ. R. 14(a) ("At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person *not a party* to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff.") (emphasis added).

[84] *See Luyster*, 266 F.R.D. at 58 ("In multiparty actions, courts have disagreed regarding whether parties on the same side, but not at the same level, of an action are 'coparties' that may cross-claim against each other.") (citing John D. Bessler, Note, *Defining "Co–Party" Within Federal Rule of Civil Procedure 13(g): Are Cross–Claims Between Original Defendants and Third–Party Defendants Allowable?*, 66 IND. L.J. 549 (1991) and Arthur F. Greenbaum, *Jacks or Better to Open: Procedural Limitations on Co–Party and Third–Party Claims*, 74 MINN. L. REV. 507 (1990)); *Murray v. Haverford Hosp. Corp.*, 278 F.Supp. 5, 6-7 (E.D. Pa.1968) (dismissing cross-claims of defendants against third party defendant upon finding Rule 13(g) "contemplated that…cross-claims should be asserted against parties having like status, such as, co-defendants"); *Earle M. Jorgenson Co. v. T.I. U.S., Ltd.*, 133 F.R.D. 472, 474-75 (E.D. Pa. 1991) (favoring construction of "co-party" as "mean[ing] any party that is not an opposing party").

[85] *See Earle M. Jorgenson Co.*, 133 F.R.D. at 475 ("'Opposing parties'…are parties that formally oppose each other on a pleaded claim, such as plaintiffs and original defendants, or third-party plaintiffs and the third-party defendants they have joined. Inasmuch as defendant…and third-party defendant…are not such opposing parties, [the] cross-claim is proper under Rule 13(g).").

any authority to persuade the Court to find that ESW and Daystar, as co-Crossclaim Defendants or as Defendant and Crossclaim Defendant, are not "co-parties" for purposes of Rule 13(g).[86]

Nor is the Court convinced that dismissal on that basis would adhere to the requirement that the Delaware Superior Court Rules "be construed and administered to secure the just, speedy and inexpensive determination of every proceeding."[87] As Daystar points out, "the filing of a cross-claim is a prerequisite to the apportionment of liability between joint tort-feasors based upon relative degrees of fault."[88] Further, "the general policy behind allowing cross-claims is to

---

[86] *See Luyster*, 266 F.R.D. at 62 ("[S]uch construction 'comports with the structure of the federal rules, which envision three types of claims that may be asserted by defendants': Rule 13(a) counterclaims against opposing parties, Rule 14(a) third-party claims against non-parties, and Rule 13(g) cross-claims against coparties.") (quoting *Georgia Ports Auth. v. Construzioni Meccaniche Industriali Genovesi, S.P.A.*, 119 F.R.D. 693, 695 (S.D. Ga. 1988) (adopting broad definition of "co-party" and concluding that "[c]ertainly, the relationship between an original defendant and a third-party defendant fits somewhere into [the] framework" provided by Rules 13(a), 13(g), and 14 such that characterizing the relationship as that of co-parties "appear[ed] to be the logical choice")).

[87] Del. Super. Ct. Civ. R. 1.

[88] *See Ikeda v. Molock*, 603 A.2d 785, 787 (Del. 1991) ("The conclusion that 10 Del.C. Ch. 63 requires a cross-claim to be filed before a jury may determine relative degrees of fault is further supported by the proposition that juries should not determine matters which are not litigated before them."). In *Ikeda*, the Supreme Court of Delaware considered the Superior Court's denial of a defendant's motion to amend his pleadings to include crossclaims against two co-defendants, both of whom had settled with the plaintiff just prior to trial, and refusal to give a joint tortfeasor instruction to the jury. The Court found the Superior Court's decision denying the defendant "the right to file the cross claims caused him significant prejudice[:]" "[a] judgment of $925,000 was rendered against him, whereas, St. Francis and Dr. Naik settled for a much smaller sum" and the defendant "was unable to reduce the judgment by the potential damages which the jury could attribute to the negligence of St. Francis and Dr. Naik." *Id.* As a result, the defendant's "monetary responsibility…might be disproportionate to the injuries caused by his negligence[,]" an outcome the provisions of title 10, chapter 63 of the Delaware Code were designed to avoid. *Id.*

26

avoid multiple suits and to encourage the determination of the entire controversy among the parties before the court with a minimum of procedural steps."[89] As a result, courts often interpret Rule 13(g) "liberally in order to settle as many related claims as possible in a single action."[90] Importantly, because ESW remained in the litigation and had not filed a Crossclaim against Daystar, the options of asserting any claim for indemnification and contribution as a counterclaim or in a third party complaint were simply unavailable to Daystar. Indeed, "[i]f a defending party cannot file a cross-claim against another party on the same side, but not at the same level, of an action, then the Rules are silent regarding how such a claim might be brought."[91]

It appears granting ESW's request for dismissal of the Crossclaims as "procedurally defective" would result in multiple actions being pursued, create unnecessary procedural hurdles, and further complicate this already complex litigation. To facilitate this outcome would clearly "run[] contrary to the purposes of Rules 13 and 14, and the mandate of Rule 1"[92] and could lead to a verdict where fault is unfairly apportioned. As such, ESW's Motion to Dismiss Daystar's claims as procedurally barred is DENIED.

---

[89] *See Luyster*, 266 F.R.D. at 62-63 (quoting 6 Wright et al., Federal Practice & Procedure § 1431, at 229-30).
[90] *See id.*
[91] *See id*.
[92] *See id.*

**B.  Are the Crossclaims Against ESW Barred by *Res Judicata*?**

Next, ESW urges the Court to dismiss "any and all crossclaims" against it

according to the doctrine of *res judicata*.  *Res judicata* will bar a claim where the

party raising the doctrine can show satisfaction of the following five-part test:

> (1) the original court had jurisdiction over the subject matter and the parties;
> (2) the parties to the original action were the same as those parties, or in
> privity, in the case at bar; (3) the original cause of action or the issues
> decided was the same as the case at bar; (4) the issues in the prior action
> must have been decided adversely to the appellants in the case at bar; and (5)
> the decree in the prior action was a final decree.[93]

The prior action upon which ESW relies is the 2012 Arbitration among

ESW, Daystar, and WHP.[94]  The 2012 Arbitration involved Daystar's counterclaim

alleging negligence against ESW for the defective masonry work it completed on

the Condominium.  There, Daystar sought to recover the cost to correct, repair, and

replace ESW's deficient work.

In October 2015, this Court found *res judicata* precluded *Plaintiffs'* claim

for negligence as against ESW as a result of the 2012 Arbitration. The Court

reasoned:

> Daystar and ESW consented to having the matter arbitrated and agreed to
> resolve all disputes and matters in controversy. The parties further agreed
> that the arbitration would be a final adjudication. … Plaintiffs are in privity

---

[93] *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 192 (Del. 2009) (quoting *Dover
Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1092 (Del. 2006)).
[94] "Valid and final arbitration awards are given the same effect as a court's judgment under the
doctrine of *res judicata*." *Mehiel v. Solo Cup Co.*, 2007 WL 901637, at *5 (Del. Super. Ct. Mar.
26, 2007) (citing *Cooper v. Celente*, 1992 WL 240419, at *6 (Del. Super. Ct. Sept. 3, 1992)).

with Daystar….Daystar pursued a claim against ESW for negligent workmanship in the construction of the stone veneer of the Condominium which is the same complaint Plaintiffs have with ESW.[95]

According to ESW, the Court's *res judicata* reasoning applies with even greater force to Daystar's Crossclaims because Daystar was a party to the 2012 Arbitration.[96] ESW contends application of the doctrine is further warranted because the Crossclaims and the 2012 Arbitration "both involve" Daystar's assertions of "negligence/negligent workmanship and breach of contract…against ESW for its masonry work at the Condominium" and the 2012 Arbitration was decided adversely to ESW.[97]

In the present litigation, Daystar asserts two Crossclaims against ESW. In the first,[98] Daystar seeks contribution and indemnification, "as applicable and allowed by law," from ESW "who has already been determined to be liable for the harms alleged by Plaintiffs…."[99] Daystar demands that, should Plaintiffs prevail on their negligence claim, "liability be apportioned against all Defendants, including

---

[95] *Washington House Condo. Ass'n of Unit Owners*, 2015 WL 6750046, at *6-7 ("Thus, the Court is satisfied that the original cause of action was the same as the current claim. Daystar's counterclaim in the ESW–Daystar Action alleged negligence against ESW for the defective masonry work it completed on the Condominium. Daystar sought to recover the cost to correct, repair, and replace ESW's deficient work. The present case also seeks recovery for ESW's negligent workmanship in its masonry construction on the Condominium. Plaintiffs' claim that the current defects were discovered after the judgment was entered in the ESW–Daystar Action does not preclude *res judicata*.").

[96] ESW's Mot. to Dismiss Crosscls. ¶ 19.

[97] *Id*. ¶ 20.

[98] Daystar Sills, Inc.'s Answ. and Crosscls. ¶¶ 151-65.

[99] *Id*. ¶ 163.

Cross-Claim Defendant ESW[,]…for contribution" according to "each co-defendant's pro rata share" of fault and that any verdict entered be reduced "by the percentage negligence the jury finds attributable to the negligent conduct of ESW."[100]  Daystar's second claim seeks contractual indemnification from ESW based on the ESW Subcontract.[101]  The Subcontract obligated ESW to indemnify and hold harmless Daystar, "[t]o the fullest extent permitted by law," "from and against claims, damages, lawsuits, losses and expenses, including but not limited to attorneys' fees" arising from ESW's work on the Condominium "but only to the extent caused by [ESW's] negligent acts or omissions…." Daystar claims it has and will continue to incur costs and attorney's fees in connection with this litigation and that ESW has not, to date, honored its obligations under the Subcontract.[102]

In response to ESW's Motion to Dismiss, Daystar argues *res judicata* is inapplicable because neither indemnity nor contribution were litigated or adjudicated in the 2012 Arbitration.  In support of its position, Daystar cites *LaPoint v. AmerisourceBergen Corp.*  In *LaPoint*, the Delaware Supreme Court held that *res judicata* could not bar a claim for indemnification where the issue of indemnification had not been raised or "adjudicated" in the prior Chancery

---

[100] *Id*. ¶¶ 162, 165.
[101] *Id*. ¶ 166.
[102] *Id*. ¶¶ 166-68, 171.

action.[103]  The Court recognized that "[c]ontractual rights that are triggered and pursued after the initial action is filed…are not barred by *res judicata* because a prior judgment 'cannot be given the effect of extinguishing claims which did not even then exist.'"[104]  The *LaPoint* Court emphasized that the record in that case "reflect[ed] that the events necessary to support an indemnification claim had not occurred before the conclusion of the proceedings in the Chancery Action" and "[t]hose facts were not, and could not have been, known to the plaintiffs in the second action at the time of the first action."[105]

Here, like in *LaPoint*, there is simply no indication that Daystar's entitlement to indemnification or contribution had been raised in connection with the 2012 Arbitration.  Nor could the issues of contribution and indemnification have been addressed at the 2012 Arbitration, given the apparent absence of third-party claims against Daystar at that time.  Rather, the 2012 Arbitration was intended solely to resolve the parties' direct claims against one another for money damages.  Plaintiffs did not discover the allegedly defective construction until

---

[103] *See LaPoint*, 970 A.2d at 192 ("The record reflects that the Bridge Stockholder Representatives did not raise the indemnification claim in the Court of Chancery. Since the indemnification claim was not 'adjudicated' in the prior Chancery Action, we hold the indemnification claim in the Superior Court was not barred by that element of *res judicata*.").
[104] *See id*. at 194 (quoting *Lawlor v. Nat'l Screen Serv. Corp*., 349 U.S. 322 (1955)) ("ABC's refusal to indemnify the Bridge Stockholder Representatives after the condition precedent to that right had been satisfied (the Court of Chancery's determination that ABC had breached the agreement) gave rise to a second independent cause of action under the Merger Agreement.").
[105] *See id*. at 195.

2014 and did not commence the instant litigation until January 2015. It was not until this point in time that Daystar's claims for contribution and indemnification first arose. Like the Chancery action in *La Point*, the Order issued in connection with the 2012 Arbitration will not "be given the effect of extinguishing claims which did not even then exist."[106] ESW's Motion to Dismiss Daystar's Crossclaims based on the doctrine *res judicata* is therefore DENIED. The Court will also deny ESW's request for attorney's fees and costs.

Finally, ESW's Motion is denied to the extent it requests dismissal of crossclaims filed by other Defendants. Throughout its briefs, ESW argues that *res judicata* bars "any and all crossclaims" against it because the "remaining Defendants…are 'in privity' with Plaintiff[s]" and all share "the same apparent interest: to find ESW was negligent, and have ESW pay its fair share of the loss."[107] While the Court suspects that this assertion is flawed for a number of reasons, it is sufficient to deny the Motion on the same basis articulated above: the Defendants' contribution and indemnification claims against ESW were not, nor could have been, adjudicated in the 2012 Arbitration.

---

[106] *See id.* at 194. *See also* 10 Del. *C.* § 6302(b) ("A joint tortfeasor is not entitled to a money judgment for contribution until he or she has by payment discharged the common liability or has paid more than his or her pro rata share thereof.").
[107]ESW's Reply Br. ¶¶ 1-2.

## III. MOTIONS FOR SUMMARY JUDGMENT

The Court will grant summary judgment pursuant to Delaware Superior Court Civil Rule 56 "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[108] In reviewing a Rule 56 motion, the Court must consider the facts in a light most favorable to the non-moving party.[109] The Court will deny summary judgment where the record before it "reasonably indicates that a material fact is in dispute or 'if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.'"[110]

### A. Daystar Sills, Inc. & David Sills

The claims that remain against Daystar and Mr. Sills include Count I (Negligence) and Count VI (Negligent Repair). Daystar and Mr. Sills (in his capacity for Daystar) contend they are entitled to summary judgment because: (1) all claims against Mr. Sills, individually, must fail because he was acting at all relevant times in his corporate capacity and, alternatively, because Plaintiffs have not produced expert testimony specific to his standard of care; (2) Count I of the

---

[108] Super. Ct. Civ. R. 56(c).
[109] *See Alabi v. DHL Airways, Inc.*, 583 A.2d 1358, 1361 (Del. 1990).
[110] *See Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del. Ch. 2008) (quoting *Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del.1962)).

Complaint (Negligence) is barred by the statute of limitations; and (3) WHCA lacks standing because it filed and pursued this litigation in a manner inconsistent with the Association's Code of Regulations. Defendant WHP has filed a Notice of Adoption with respect to the lack of standing argument.[111]

### 1. *David Sills*

Mr. Sills is represented by two different sets of counsel in this case. One law firm is representing him in conjunction with Daystar and the other is defending him in his capacity as co-manager of WHP.[112] As a result, two separate Motions for Summary Judgment have been filed implicating Mr. Sills. Both Motions assert essentially the same two grounds in support of summary judgment: (1) Mr. Sills cannot be held personally liable for the alleged negligence of WHP and Daystar; and (2) Plaintiffs have failed to identify an expert specific to Mr. Sills' individual negligence. The Court will address these issues, as they relate to both entities, collectively in turn.

#### a. Personal liability

Generally, an officer cannot be held liable for the actions of a corporation merely by virtue of his or her corporate position. However, under the "personal

---

[111] D.I. 242. WHP's Notice of Adoption purports to adopt this defense as made in the Motions of both Daystar and AC. However, from what the Court can tell, AC has not argued for dismissal based on WHCA's noncompliance with the Code of Regulations.

[112] *See* Def. David N. Sills' (In His Capacity for Washington House Partners, LLC) Reply Br. in Supp. of Mot. for Summ. J. at 2; Hearing Tr. (Jan. 18, 2017) at 66: 12-23.

participation doctrine," an officer who "*directly participates* in…tortious conduct" may face personal liability even if he or she was "acting on behalf of the corporation."[113]  The doctrine aims to prevent corporate officers from escaping tort liability simply because the officer's actions were taken "in the name of the corporation."[114]  For an officer-defendant to be held liable, "it must be for acts of their own, and not merely for acts or omissions of the Corporation."[115] Allegations of "nonfeasance or the omission of an act which a person ought to do" are insufficient.[116] Rather, the officer must be alleged to have acted affirmatively by "directing, ordering, ratifying, approving or consenting to the tort" to face personal liability.[117]

Here, it is clear Mr. Sills not only possessed significant control over but was in fact Daystar, WHP, and the Washington House project.  Daystar is wholly-

---

[113]*See Yavar Rzayev, LLC v. Roffman*, 2015 WL 5167930, at *6 (Del. Super. Ct. Aug. 31, 2015) (emphasis added). *See also Ayers v. Quillen*, 2004 WL 1965866, at *3 (Del. Super. Ct. June 30, 2004) ("A director, officer, or agent is not liable for torts of the corporation merely because of his office; he is liable for torts in which he has participated or which he has authorized or directed.") (citing 19 C.J.S. Corporations § 544 (1990)); *St. James Recreation, LLC v. Rieger Opportunity P'rs, LLC*, 2003 WL 22659875, at *2 (Del. Ch. Nov. 5, 2003) ("The default rule in American law is that corporate officials may be held individually liable for their tortious conduct even if they were acting officially for the corporation in committing the tort.").
[114]*See Brandt v. Rokeby Realty Co.*, 2004 WL 2050519, at *9 (Del. Super. Ct. Sept. 8, 2004) (quoting *Heronemus v. Ulrick*, 1997 WL 524127, at *2 (Del. Super. Ct. July 9, 1997)).
[115] *See Gassis v. Corkery*, 2014 WL 3565418, at *5 (Del. Ch. July 21, 2014) ("Under agency principles, a corporation is liable for the acts of its officers and directors, but acts taken by the corporate principal are not automatically imputed to its agents."), *aff'd*, 113 A.3d 1080 (Del. 2015).
[116] *Brandt*, 2004 WL 2050519, at *10; *Heronemus*, 1997 WL 524127, at *2-3.
[117] *See Gassis*, 2014 WL 3565418, at *5; *Heronemus*, 1997 WL 524127, at *2.

owned by Mr. Sills and he serves as President of the construction company. When asked about the management of Daystar, Mr. Sills responded that he "pretty much run[s] the whole thing."[118]  Mr. Sills also formed WHP for the sale and management of the project.[119]  It would appear Mr. Sills used his control over these entities to cause WHP to hire Daystar as general contractor for the Washington House project, to name himself the sole Council member during the Developer Control Period, and to direct all repair and property management work to Daystar. All major decisions relating to the construction of the Condominium were made by Mr. Sills, and he signed all contracts, subcontracts, and payment applications on behalf of Daystar and WHP.

While these facts alone are incapable of establishing liability under the personal participation doctrine, Plaintiffs have alleged sufficient facts supporting that Mr. Sills personally "directed, ordered, ratified, approved, or consented to" Daystar's negligent construction and repair of the Condominium. Significantly, Mr. Sills approved the decision to direct AC's modification of its design plans for the exterior façade from full brick to thin brick veneer.  Mr. Sills also apparently participated in selecting the thin brick product ESW ultimately installed on the building's exterior. While it is unclear whether Mr. Sills knew or should have

---

[118] Sills Dep. (June 30, 2016) at 9:23-24, 10:1-3.
[119] Compl. ¶ 22.

known the risks of using the thin brick system prior to directing the change to AC's drawings,[120] he was aware of AC's concerns with the veneer by February 2008 at the latest. At that time, Mr. Cihlar explained that AC had "continually expressed [its] concern…regarding the appropriateness of exterior thin brick" on a building like the Washington House, which is "subject to freeze/thaw in the North East climate."[121] AC's email emphasized the lack of support and guidance for utilizing thin brick assembly in such a climate, and advised that Daystar carefully monitor the installation of the veneer to ensure "the ability of movement, flashing, and drainage of the system."[122] Despite warnings, Mr. Sills directed that the project proceed and apparently even attempted to expedite ESW's installation of the veneer.[123] These facts, if proven, are exactly the kind that should and do prevent

---

[120] There was apparently a meeting between Daystar and AC representatives in May 2007, before any modification was made to the original design plans, during which AC first expressed its concern about employing the thin brick system. In particular, Michael Cihlar of AC testified that he expressed concern over the lack of research and testing on the masonry veneer product and the corresponding absence of industry standards and information as to the product's long-term performance. *See* Cihlar Dep. at 37-39. It is unclear, however, if Mr. Sills was present at this meeting. *See generally Panansewicz v. Jennings*, 2014 WL 1270014, at *4 (Del. Super. Ct. Jan. 27, 2014) (finding issue of fact as to whether defendants "were aware or should have been aware through reasonable inspection" of defective condition when the record contained inconsistencies).

[121] Pls.' Ex. 659. The email is addressed to J.R. Leonard, who was employed by Daystar at the time. Leonard then forwarded the email to Mr. Sills. Pls.' Ex. 661A.

[122] Pls.' Ex. 659.

[123] In response to the concerns of Daystar's project manager that the schedule for completing construction was "aggressive" and "unattainable," Mr. Sills was apparently adamant that the project push forward and ordered that Leonard impose pressure on ESW to complete the masonry work as quickly as possible. Leonard Dep. 160-61, 184, 236-37; Pls.' Ex. 671 (Leonard's April 2008 email to ESW). ESW representatives testified consistently, stating ESW was urged to "just get it done" because WHP was anxious to start selling the units. Abrogast Dep. at 122-27, 213.

individual officers from escaping liability and clearly distinguish the instant case from those in which Delaware Courts have refused to impose personal liability.[124] The Motion for Summary Judgment filed on behalf of Mr. Sills in his capacity for Daystar will be DENIED.

With regard to WHP, Plaintiffs also argue Mr. Sills should be held personally liable for WHP's negligence in selling units to purchasers without disclosing known defects and/or failing to adequately remedy the defects. These allegations, without more, are insufficient to invoke the personal participation

---

[124] *See T.V. Spano Bldg. Corp. v. Dep't of Nat. Res. & Envtl. Control,* 628 A.2d 53 (Del. 1993); *Brandt*, 2004 WL 2050519, at *10. In *T.V. Spano*, both the residential real estate development corporation, TVSBC, and its corporate officer, Mr. Spano, were sued for improperly disposing of hazardous construction waste. *See T.V. Spano*, 628 A.2d at 55. TVSBC employed a subcontractor to clear and dispose of trees, brush, and other matter from the land on which it planned to develop a residential community. *See id.* Decisions as to the disposal of the pre-construction debris were made at a meeting attended by TVSBC staff and the subcontractor, but not Mr. Spano personally. *See id.* Mr. Spano visited the construction site weekly and personally observed the disposal of the waste. *See id.* Despite Mr. Spano's "broad, general authority" over the real estate project and "direct knowledge of the disposal trenches," the Court found he could not be held liable because there was no evidence to suggest Mr. Spano ratified or otherwise approved of the disposal plan. *See id.* at 55, 62. Rather, those decisions were clearly made by TVSBC's attorneys, the subcontractor, and the New Castle County officials. *See id.* at 55. Similarly, in *Brandt*, the Court refused to find the defendant-realty company's president personally liable for the plaintiff's mold-induced injuries because there was no evidence the president "took any affirmative actions which harmed [the plaintiff]." *Brandt*, 2004 WL 2050519, at *10. The president's knowledge "about health complaints" was "insufficient for liability," and the plaintiff did not show either that the president "was the one who ordered or approved of any of Service's work regarding the heat pumps." *See id.* Unlike those cases, this matter involves tortious acts and conduct directed and consented to by Mr. Sills. *See Heronemus*, 1997 WL 524127, at *2 (citing *Steinke v. Beach Bungee, Inc.*, 105 F.3d 192 (4th Cir. 1997) (finding personal liability where officers alleged to have known of equipment issues, rejected recommendation to hire engineer, installed knew system despite warnings it was unsuitable, attempted to physically conceal warnings, and affixed false license to the machinery)).

doctrine. Personal liability cannot be assessed absent "active negligence" and a corporate agent's knowledge of defects and failure to warn or correct those defects will generally be considered acts of *nonfeasance*.[125] That said, the Court is not in a position to grant Mr. Sills' Motion as it finds that there remain disputed issues of facts that prevent summary judgment. For example, there is evidence suggesting that Mr. Sills actively directed that disclosures of defects not be provided to purchasers. It appears Mr. Sills made other questionable decisions based upon the financial pressures that were occurring with the project. This evidence may either directly or circumstantially suggest this was a deliberate and conscious decision by Mr. Sills and WHP to mislead others and that this conduct was approved and ratified by Mr. Sills. Therefore, Mr. Sills' liability in this regard will have to await resolution at trial. As such, the Motion as to Mr. Sills and WHP will also be DENIED.

    b. Expert testimony

    General negligence claims usually do not require expert testimony.[126] Where professionals are involved, however, the applicable standard of care must

---

[125] *See Brandt*, 2004 WL 2050519, at *10 ("Claims based on the failure to warn, inspect or repair, or implement and supervise indoor air quality programs for common areas affected by mold are acts of nonfeasance."); *Heronemus*, 1997 WL 524127, at *3 (finding "failure to warn, failure to provide safety spotters and failure to test the game…claims of nonfeasance").

[126] *See, e.g.*, *Yancy v. Tri State Mall Ltd. P'ship*, 2014 WL 2538805, at *3 (Del. Super. Ct. May 29, 2014). *See also Robelen Piano Company v. DiFonzo*, 169 A.2d 240, 244-5 (Del.1961) ("The standard of care required of all defendants in tort actions is that of a reasonably prudent man. That standard, however, is not a definite rule easily applicable to every state of facts. The details

typically be established through the use of an expert.[127] The exception to this rule is when a lay person would be as competent as an expert to judge whether or not the particular conduct created an unreasonable risk.[128] "For example, the fact that people cut corners is commonly known and does not require expert testimony in a faulty landscaping design case."[129]

In this case, Plaintiffs have identified two experts, each of whom detail the construction and design defects and opine as to WHP, AC, and Daystar's negligence as the project developer, architect, and contractor. There does not appear to be any testimony pertaining to Mr. Sills, individually. According to Defendants, Plaintiffs were required to engage an expert to opine specifically as to his standard of care and summary judgment is warranted as a result of their failure to proffer such testimony. Plaintiffs respond that their claims against Daystar and WHP is amply supported by expert testimony, and that, because their claim against

---

of the standard, of necessity, must be formulated in each particular case in light of its peculiar facts. In each case the question comes down to 'what a reasonable man would have done under the circumstances.' In close or doubtful cases, ... that question is to be determined by the jury.").

[127] *See Seiler v. Levitz Furniture Co. of E. Region, Inc*., 367 A.2d 999, 1008 (Del. 1976).

[128] *See Oliver v. Bancroft Const. Co*., 2011 WL 5042389, at *1 (Del. Super. Ct. Oct. 21, 2011).

[129] *Brandt*, 2004 WL 2050519, at *5 (citing *Ward v. Shoney's, Inc.,* 817 A.2d 799, 803 (Del.2003)). "Jurors know that different dimensions of steel compromise the structural integrity of buildings and do not need specialized testimony to show that buildings may collapse from a defect of this nature. Likewise, common sense would permit a fact finder to decide an architect had notice of flooding when advised that his proposed building was two feet lower than recent flooding." *Id*. (citing *City of New York v. Turner- 31 Murphy Co*., 452 S.E.2d 615, 618 (S.C.Ct.App.1994) and *Seiler v. Levitz Furniture, Co.*, 367 A.2d 999, 1008 (Del.1976) (finding architect's mistake so apparent as to obviate need for expert testimony to establish "benchmark by which his standard of care is measured")).

Mr. Sills is for general negligence, rather than professional negligence, no further expert testimony is required.[130]

The Court is confident that no further expert testimony is required as to Mr. Sills. Any factual information potentially falling outside the common knowledge of the jury would seem to be adequately addressed by the expert testimony as to general construction and oversight of the project, especially given Mr. Sills relationship with WHP and Daystar. Summary judgment is therefore DENIED.

## 2. *Statute of Limitations*

Plaintiffs filed this litigation on January 14, 2015. Daystar and Mr. Sills contend summary judgment should be granted as to Count I (Negligence) because the claim is barred by the applicable statute of limitations set forth in 6 *Del. C.* § 8106.[131]

---

[130] Pls.' Answ. Br. in Opp'n to David N. Sills, IV's Mots. for Summ. J. at 31-32.

[131] 10 *Del. C.* § 8106 (providing that "no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action"). Plaintiffs have also asserted a claim for Negligent Repair against Daystar, Mr. Sills, and WHP. Defendants have not sought summary judgment for failure to comply with the statute of limitations on the Negligent Repair claim. Additionally, it is worth noting that WHP has not joined Daystar and Mr. Sills to the extent their Motion seeks summary judgment based on the statute of limitations, possibly because WHP is the Declarant for the Condominium and Delaware's Uniform Common Interest Ownership Act provides an extended limitations period for actions against a Declarant. *See* 25 *Del. C.* §§ 18-311(c), 18-321 ("…[A]ny statute of limitation affecting the association's right of action against a declarant under this chapter is tolled until the period of declarant control terminates. A unit owner is not precluded from maintaining an action contemplated by this section because that person is a unit owner or a member or officer of the association."). *See also id.* § 81-119 (making listed provisions applicable to certain condominium properties recorded under UPA subject to condominium governing documents).

Under the statute, Plaintiffs were required to file their negligence claim within "3 years from the *accruing* of the cause of such action."[132]  A cause of action "accrues" at the time of the alleged wrongful act, "even if the plaintiff is ignorant of the cause of action."[133] With respect to claims sounding in negligence, "the wrongful act" will generally refer to "the time of the injury" for accrual purposes.[134]

Count I asserts a claim for negligence against all Defendants in connection with the development, design, and construction of the Condominium.  The parties appear to agree that this cause of action accrued in October of 2008, when construction of the Condominium was completed and the Declaration and Regulations were recorded.  While the Court is not convinced that this is the correct date, it will accept it for purposes of this Motion.  As the present litigation was filed in January 2015, over six years from the project's completion, using the 2008 date, Plaintiffs must establish that the statute of limitations was tolled until at least January 2012 in order to avoid the time bar. [135]

---

[132]10 *Del. C.* § 8106(a) (emphasis added).
[133] *See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999).
[134] *See Silverstein v. Fischer*, 2016 WL 3020858, at *4 (Del. Super. Ct. May 18, 2016) ("The 'wrongful act' is a general concept that varies depending on the nature of the claim at issue…. The cause of action for negligence accrues at 'the time of the injury.'").
[135]*See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (explaining that it is the burden of the party raising tolling to establish that a tolling doctrine applies).

The statute of limitations may be tolled where the facts underlying a cause of action "were so hidden that a reasonable plaintiff could not timely discover them."[136] Where tolling applies, the statutory period will be suspended until the plaintiff possessed "inquiry notice" of its claim.[137] A party is deemed to have inquiry notice when he or she "discovers the facts constituting a basis for the cause of action, or knows facts sufficient 'to put a person of ordinary intelligence ... on inquiry, which, if pursued, would lead to the discovery of such facts."[138]

According to Plaintiffs, the statutory period was tolled up until "the summer of 2014 when WHCA received advice from its professionals that there were serious construction and design defects at the condominium, in particular with the exterior veneer."[139] In support of this position, Plaintiffs advance three theories of tolling: (1) the doctrine of inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling.

The doctrine of inherently unknowable injuries tolls the running of the statute of limitations "while the discovery of the existence of a cause of action is a *practical impossibility*."[140] The discovery rule requires Plaintiffs to demonstrate

---

[136] *See id.* at *5.

[137] *See id.* at *8 (stating that inquiry notice exists when a plaintiff is "*objectively* aware of the facts giving rise to the wrong") (emphasis in original).

[138] *See Russum v. Russum*, 2011 WL 4731120, at *2 (Del. Super. Ct. Sept. 28, 2011) (quoting *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004)).

[139] *See* Pls.' Answ. Br. in Opp'n to Daystar Sills, Inc.'s Mot. for Summ. J. at 12.

[140] *See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5 (emphasis added).

43

that there were no observable factors which would provide notice of their injury and that they were *blamelessly ignorant* of the wrongful acts or omissions and injury complained of.[141]

In contrast to the discovery rule, fraudulent concealment requires a showing that the defendant engaged in an "affirmative act of concealment" to "put the plaintiff off the trail or inquiry" and prevent the plaintiff "from gaining knowledge of the facts." [142] Two elements must be present in order to toll the statute of limitations: (1) the defendant "acted in an affirmative manner to conceal the cause of action from Plaintiffs," and (2) the defendant "[knew] about the alleged wrong."[143]

Finally, the statutory period may be tolled under the theory of equitable tolling. Delaware Courts recognize three contexts in which equitable tolling may apply: "(1) where the defendant misled the plaintiff, (2) where the plaintiff was prevented from asserting his rights in some extraordinary way, and (3) where the plaintiff has timely asserted his rights mistakenly in the wrong forum."[144] "[R]easonable reliance on the competence and good faith of those who have

---

[141] *See id.*
[142] *See id.*
[143] *See Lavender v. Koenig*, 2017 WL 443696, at *4 (Del. Super. Ct. Feb. 1, 2017) (citing *Wright v. Dumizo*, 2002 WL 31357891, at *3 (Del. Super. Ct. Oct. 17, 2002)).
[144] *See Owens v. Carman Ford, Inc.*, 2013 WL 5496821, at *3 (Del. Super. Ct. Sept. 20, 2013) (noting that Delaware state courts recognize the same three scenarios in which equitable tolling may appropriately be applied as the U.S. District Court of Delaware and Third Circuit Court of Appeals).

assumed a legal responsibility toward a plaintiff" may justify application of the equitable tolling doctrine.[145]

Here, Plaintiffs claim the construction defects at the Washington House, especially with regard to the failure of the exterior veneer, were "latent defects, hidden behind the walls of the building."[146] Plaintiffs insist the WHCA was diligent in seeking to determine whether any significant problems existed at the property, as evidenced by their retention of Alpha to inspect the property soon after the Turnover. Plaintiffs emphasize Alpha's May 2012 inspection report, which recommended only minor repairs to the building and opined that "the exterior stone and brick appear in good condition."[147] Thus, at that time, WHCA had no reason to believe that the Condominium contained significant design and construction defects. Plaintiffs claim their ability to discover their cause of action was further frustrated by the Daystar Defendants fraudulent concealment of known defects and information pertaining to their counterclaim against ESW, such as the expert reports submitted at arbitration. Finally, Plaintiffs claim equitable tolling principles apply here because Plaintiffs reasonably relied on the good faith and

---

[145] *See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *8 ("But, the trusting plaintiff still must be reasonably attentive to his interests…. Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available.").
[146] Pls.' Answ. Br. in Opp'n to Daystar Sills, Inc.'s Mot. for Summ. J. at 13.
[147] Chase Aff., Ex. C at 3.

competence of the Defendants in their various positions of authority and trust and "were misled [by Defendants] as to the need to assert their rights in court."[148]

Construing the record in a light most favorable to Plaintiffs, the Court finds the defects contained within the walls of the Condominium may reasonably be characterized as "inherently unknowable," at this stage, for purposes of determining whether the discovery rule may apply to toll the statute of limitations.[149] Daystar even acknowledged in its December 2011 arbitration briefing that it was "unknown what damage lurks inside the walls currently" as a result of ESW's negligent installation of the exterior, and that, only upon retaining experts and consultants and performing invasive testing on one of the units, was mold and water damage within the walls revealed.[150]

---

[148] Pls.' Answ. Br. in Opp'n to Daystar Sills, Inc.'s Mot. for Summ. J. at 27.

[149] *See Bromwich v. Hanby*, 2010 WL 8250796, at *5 (Del. Super. Ct. July 1, 2010) ("Plaintiffs allege they could not have discovered the buried foundation defects until May of 2007. When Plaintiffs knew or should have known of the alleged wrong is a question of fact that precludes the granting of summary judgment on Count III."); *Council of Unit Owners of Sea Colony E., Phase III Condo., on Behalf of Ass'n of Owners v. Carl M. Freeman Assocs. Inc.*, 1988 WL 90569, at *5 (Del. Super. Ct. Aug. 16, 1988) ("[T]he alleged construction and design defects in the exterior wood panels and concrete structures are inherently unknowable as they could not be discovered without the assistance of an inspection by a specialist. Both plaintiff and defendants needed experts to determine the cause of the wall and concrete deterioration. Therefore, the discovery rule will apply.") (internal citation omitted). *See also Young & McPherson Funeral Home, Inc. v. Butler's Home Improvement, LLC*, 2015 WL 4656486, at *2 (Del. Super. Ct. Aug. 6, 2015) (denying motion to dismiss negligence action to the extent the claim was premised on defective "construction work in the interior of the walls, chimney, and roof" because the discovery rule tolled the statute of limitations until 2013 when plaintiffs were first informed by the City Code Enforcement Department that defendants did not replace the roof and underlying damage "as promised" but simply added new tiles to hide the deficiencies).

[150] Pls.' Ex. 1005 at 7.

Even if the discovery rule applies, Daystar Defendants argue the record irrefutably shows that Plaintiffs were on inquiry notice of "the leaks and construction issues of which they complain since 2009."[151] Defendants emphasize that Daystar issued a notice in February 2009 about the mechanics lien filed by ESW, that the pleadings related to Daystar's counterclaim were publicly available in April 2009, and that the record shows certain owners began experiencing water intrusion issues in their individual units as early as 2009, with the leaking problems raised at the Owners Forum beginning in 2010. According to Defendants, at the very latest, the statute of limitations began to run in 2011. In particular, Defendants point to March 2011, when unit owners Drs. Piper and Tuttle consulted an architect (Jim Cherry of AC), leak consultant, and environmental specialist about the water intrusion issues in their unit, portions of brick were removed in the process, and it was discovered that the leaking was coming from above and causing deterioration "in part due to inadequate flashing…[and] because there is no expansion joint between floors 3 and 4 next to the towers."[152] At the October 2011 Owners Forum, Ms. Tuttle reported that she had met with "the architect," AC regarding the issues with her unit, and that AC was "concerned about what is under

---

[151] Daystar Defs.' Mot. for Summ. J., at 36.
[152] *Id*., Ex. T.

the brick" because if the flashing is not properly done, "there are concerns about the strength of the barrier between the Tyvek and porous brick."[153]

However, Plaintiffs have provided sufficient evidence to show that the Association stood in a unique relationship with both Mr. Sills and Daystar, whereby the WHCA was in fact, until at least January 19, 2012, only Mr. Sills. As such, in essence Mr. Sills is arguing for dismissal over a date which only he had control over. There is no question that before January of 2012 the homeowners were aware they had some leakage issues but nothing to suggest the extent of issues subsequently discovered. Throughout 2011 and into March 2012, Mr. Sills agreed to address all problems reflected on the Association's building issues list related to building and construction.[154] The unit owners, none of whom appear to have any background in or specialized knowledge of construction, thus reasonably perceived the issues to fall into the category of "punch list" items not uncommon in new construction.

While Daystar appears to have corrected some of the conditions reported by the Association, it is undisputed that Daystar never took any action to remediate the building's defective exterior veneer. By 2011, Daystar knew based on the expert reports it submitted at arbitration that the faulty brick veneer would need to

---

[153] Daystar Defs.' Reply Br., Exs. NN, OO at 177.
[154] Pls.' Exs. 1020, 1017, 1019.

be removed and replaced. Daystar did not use the arbitration award to execute the recommended remedial measures, nor did Daystar or Mr. Sills ever once inform the Association about the exterior's defective design and installation. Given the Daystar Defendants knowledge of the true extent of the defects and what it would take to repair those defects, their assurances to unit owners and implementation of temporary solutions to the water intrusion and other related issues could be construed as affirmative conduct intended to lead Plaintiffs off the trail of inquiry.

This is a complex case, involving latent defects and the actions of a number of parties taken in varying capacities. Further, while the record indicates that a handful of owners experienced leaks in their individual units as early as 2009, Plaintiffs have insisted that this litigation is about damage to the Condominium's common elements, namely, the building's defective exterior.[155] Alpha's May 2012 inspection reported that the exterior appeared in good condition. It appears the first external indication that the exterior could contain serious defects surfaced in 2013, when the owners noticed the bricks had started to bulge. Given these facts, the complicated nature of the defects, allegations of concealment, the roles, duties, and conduct of Daystar and Mr. Sills, the Court is unwilling to find at this juncture that the Plaintiffs possessed sufficient notice, based on isolated leaking issues and the mechanics lien notice, that the Condominium's exterior was defectively designed

---

[155] Hearing Tr. (Jan. 18, 2017) at 31:16-21.

and constructed.  Construing the record in a light most favorable to the Plaintiffs, reasonable knowledge and notice of the deficiencies occurred in August of 2014 when the Cogent inspection was performed.  Assuming this begins the running of the statute of limitations, the litigation was filed timely.[156]

### 3.  *Standing of WHCA*

The Daystar Defendants next contend this litigation should be dismissed because Plaintiff WHCA lacked authority to file and maintain this action under the Code of Regulations. Defendant WHP joins the Daystar Defendants in asserting this position.[157] The Court can only characterize this claim as a true "Hail Mary."

The basis for Defendants' argument is the WHCA's failure to adhere to Article V, Section 17 of the Code of Regulations.  The Code provides that the decision to initiate legal proceedings "in connection with any dispute, claim, cause of action or proceeding arising out of or under or in connection with the Declaration, the Code of Regulations or the Declaration Plan" must be made "by a resolution duly adopted at a properly noticed regular or special meeting of the Association held for such purpose."[158]  If such proceedings are commenced and do not conclude "within  one (1) year of the date of such resolution, the continued

---

[156] At the earliest, the obligation to explore further did not occur until the owners took ownership of the condominium association on January 19, 2012.

[157] D.I. 242.

[158] COR at Art. V § 17.

prosecution…must be reaffirmed annually at a special meeting held of the Association."[159]

While Plaintiffs do not dispute WHCA's noncompliance with these rules, they claim summary judgment should be denied because: (1) Article V, Section 17 does not apply to this lawsuit because this action is not an internal dispute; (2) WHP waived its right, while a unit owner, to object to the litigation and/or WHCA's noncompliance with the Code; (3) the Defendants have no right to redress under the WHCA's Code of Regulations; and (4) the unit owners overwhelmingly support this lawsuit.

Although the Court is not convinced by Plaintiffs' argument concerning the applicability of Section 17 to this litigation, which originally included claims for violations of the Code of Regulations and Declaration, it is persuaded that the purpose of Section 17 and the Regulations would not be served by allowing persons outside of the agreement to invoke protections intended for the benefit of unit owners. These Defendants either never were, or no longer are, unit owners. The Defendants' interests in defeating this lawsuit are clearly inimical to the interests of the unit owners. Neither the Regulations nor the Unit Property Act

---

[159] *See id.* ("If the continued prosecution…is not reaffirmed, the action shall be discontinued and the Council shall have no further authority to act as the attorney-in-fact for the Association in the further prosecution or defense of such Legal Proceedings.").

contemplates the ability of outsiders to intrude upon the authority of the Council as Defendants are attempting to do here.

Moreover, WHP was a unit owner for roughly seven months following commencement of this litigation. WHP never objected to this litigation or sought to enforce WHCA compliance with internal regulations prior to selling its last Condominium unit in August 2015[160] In fact, its silence and inaction continued throughout Rule 12 briefing in the instant action.[161]

Finally, the affidavits submitted confirm that, to date, no unit owners have objected to the lawsuit.[162] Given this information, and the absence of any persuasive authority entitling outsiders to summary relief based on internal condominium association regulations, Defendants' Motion must be DENIED.

## B. Architectural Concepts

Count I of the Complaint seeks to hold AC liable, as the architect on the project, for the Washington House's allegedly negligent design. Various

---

[160] As a unit owner, WHP received due notice of all meetings, through the notices posted at Washington House, and also by emails to Mr. Sills, as a managing member of WHP. From September 9, 2014, through August 27, 2015 — the sale date of the last WHP-owned unit — all email meeting notices sent to David Sills were left unopened, except for the notice of a Council meeting on August 11, 2015. WHP did not attend any of those meetings.

[161] *See New Castle Cnty. v. Pike Creek Recreational Servs., LLC*, 82 A.3d 731, 751 (Del. Ch. 2013), *aff'd*, 105 A.3d 990 (Del. 2014) (finding voluntary and intentional waiver of right to object to proposed development plan by County's inaction); *Mizel v. Xenonics, Inc.*, 2007 WL 4662113, at *7 (Del. Super. Ct. Oct. 25, 2007) (explaining that acquiescence arises when party knows rights and material facts but remains inactive, recognizes complained of act, or leads other party to believe act has been approved despite subsequent repudiation).

[162] Swan Aff. ¶ 8 (stating that the Council also receives messages of approval concerning the lawsuit on a regular basis).

52

Defendants have asserted crossclaims against AC for indemnification. In the instant Motion, AC requests summary judgment be granted in its favor on the grounds that: (1) Plaintiffs' negligence claim and Defendants' crossclaims are barred by the doctrine of collateral estoppel; (2) WHCA's claim for negligence is untimely; and (3) no evidence has been proffered to support any causal connection between AC's alleged acts or omissions and the Condominium's defective façade. For the foregoing reasons, AC's Motion will be DENIED.

### 1. *Collateral Estoppel*

In 2010, AC filed a lawsuit against Daystar and WHP for nonpayment and WHP counterclaimed, arguing WHP incurred significant costs directly due to AC's failure to coordinate and remedy errors and inconsistencies in its plans (the "AC-WHP Action"). In particular, WHP alleged AC's plans were "not constructable" and that WHP had to redesign "the entire front elevation of the project."[163] WHP claimed that AC was required to provide plans "free from defects" in a timely manner, and that its failure to do so constituted breach of contract.[164] The parties apparently settled their dispute and the claims were dismissed with prejudice by stipulation in January 2013.

---

[163] Pls.' Ex. 1026, ¶ 5.
[164] *Id*. ¶¶ 6-7.

As a result of the AC-WHP Action, AC contends Plaintiffs' negligence claim and Defendants' crossclaims against AC are barred by collateral estoppel. A party raising collateral estoppel bears "the burden of showing that the issue whose relitigation he seeks to foreclose was *actually decided* in the first proceeding."[165] Thus, the test applied for purposes of collateral estoppel requires: "(1) a question of fact essential to the judgment (2) be litigated and (3) determined (4) by a valid and final judgment."[166]

Generally, "a dismissal with prejudice has the effect of a final adjudication on the merits."[167] However, there is a distinction "between the concept a final adjudication on the merits and *the actual litigation of facts*."[168] Delaware courts have recognized that "a dismissal with prejudice is not a determination of the facts of the case by the Court but is as binding upon the parties as such a final decree would be."[169] While a dismissal with prejudice lacking specific factual

---

[165] *See CompuCom Sys., Inc. v. Getronics Fin. Hldgs. B.V.*, 2012 WL 4963314, at *2 (D. Del. Oct. 16, 2012) (quoting *Proctor v. Delaware,* 2007 WL 2229013 (Del. Aug. 2, 2007)) (emphasis added).

[166] *See HealthTrio, Inc. v. Margules*, 2007 WL 544156, at *9 (Del. Super. Ct. Jan. 16, 2007) (quoting *Taylor v. State,* 402 A.2d 373 (Del.1979)).

[167] *See Fields v. Frazier*, 2005 WL 3193820, at *2 (Del. Super. Ct. Nov. 21, 2005) (citing *Salavaara v. SSP Advisors, I.P.,* 2003 WL 23190391 (Del. Ch. Dec. 22, 2003)). Thus, where parties "voluntarily dismissed the action, knowing that they either received the full relief to which they were legally entitled, or that they waived their rights to seek further relief, the dismissal is tantamount to a judgment on the merits." *Id.*

[168] *See Spectris Inc. v. 1997 Milton B. Hollander Family Trust*, 997 N.Y.S.2d 101 (N.Y. Sup. 2014) (discussing Delaware law) (emphasis added), *aff'd*, 138 A.D.3d 626, 31 N.Y.S.3d 469 (N.Y. App. Div. 2016)

[169] *See Rochen v. Huang*, 1989 WL 5160, at *1 (Del. Super. Ct. Jan. 13, 1989).

determinations may bar the parties to that action from re-asserting the dismissed *claims* against one another, the doctrine of collateral estoppel concerns the re-litigation of the *factual issues* underlying those claims.[170] Indeed, "the public policy surrounding…collateral estoppel is to require a definitive end to litigation when each of the parties has had a full, free and untrammeled opportunity to present all of the facts pertinent to the controversy."[171]

The Delaware Superior Court Judge's order granting stipulated dismissal of the AC-WHP Action with prejudice supplies absolutely no basis for this Court to apply the doctrine of collateral estoppel. Again, collateral estoppel aims to "preclude[] a *redetermination of facts actually litigated* and *determined* in a prior proceeding."[172] Here, there is no indication that the facts and/or issues relevant to the question of AC's negligence were actually considered and determined in the AC-WHP Action. While the policy rationale for application of collateral estoppel "is forceful where the merits of the case have previously been considered[,]" this force is necessarily lacking where, as here, the "litigation is concluded by a

---

[170] *See id.*
[171] *See Fox v. Christina Square Assoc., L.P.*, 1994 WL 146023, at *4 (Del. Super. Ct. Apr. 5, 1994) (citing *Coca-Cola v. Pepsi-Cola Co.,* 172 A. 260 (Del. Super. Ct. 1934)).
[172] *See Belfint, Lyons, & Shuman v. Potts Welding & Boiler Repair, Co.*, 2006 WL 2788188, at *3 (Del. Super. Ct. Aug. 28, 2006) (citing *James v. Tandy Corp.*, 1984 WL 8256, at *4 (Del. Ch. Nov. 1, 1984)). *See also Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 89-90 (Del. Ch. 2013) ("[A] judgment in one cause of action is conclusive in a subsequent and different cause of action as to a question of fact actually litigated by the parties and determined in the first action." (quoting *E.B.R. Corp. v. PSL Air Lease Corp.*, 313 A.2d 893, 894-95 (Del.1973))).

stipulation of dismissal and the merits have not been considered."[173]  In addition,

Defendants' crossclaims for indemnification and contribution did not exist at the

time of the AC-WHP Action, and as a result, are not barred by collateral estoppel.

Accordingly, AC's Motion for Summary Judgment based on the doctrine of

collateral estoppel is denied.

### 2.  *Statute of Limitations*

AC also advances a statute of limitations argument in support of its Motion

for Summary Judgment.  AC does not appear to contest claims of the Montgomery

Plaintiffs on this basis; rather, it argues WHCA's negligence action is time-barred.

Once again, claims for negligence are subject to the three-year statute of

limitations set forth in 10 *Del. C*. § 8106.

AC performed architectural services in connection with the Washington

House between 2006 and 2008.  The Condominium was substantially completed in

October of 2008.  Applying § 8106, WHCA was required to file its negligent

design claim against AC prior to October 2011.  Because Plaintiffs did not initiate

this litigation until January 14, 2015, the WHCA's claims are time-barred unless it

can show that tolling applies. Plaintiffs rely on many of the same tolling arguments

---

[173] *See Fox*, 1994 WL 146023, at *4.

discussed above with regard to the Daystar Defendants' Motion.[174] According to Plaintiffs, "AC contributed significantly to the circumstances that justify tolling the statute of limitations until Plaintiffs were on inquiry notice in 2014."[175]

AC responds that, even if a tolling could be established here, the evidence shows WHCA was aware of the facts underlying its claims well before it filed this litigation. AC emphasizes many of the same facts and circumstances raised by the Daystar Defendants in support of its position, including that individual unit owners experienced leak issues in 2009, the ESW mechanics' lien notice and publicly available counterclaim pleadings, and discussions of retaining an inspector and water intrusion problems among WHCA members in 2010 and 2011. AC even goes so far as to argue that the WHCA had notice of its claims against AC in 2008-2009, by virtue of David Sills' knowledge of the Condominium's defective exterior, which is evidenced by Mr. Sills' email to ESW about his dissatisfaction with their work and pleadings and documents related to the ESW-Daystar dispute, among other things. AC characterizes WHP, Daystar, and WHCA as "artificial entities," all of which must be charged with any knowledge possessed by their agents. According to AC, because David Sills was clearly aware of the defects in

---

[174] Pls.' Answ. Br. in Opp'n to AC's Mot. for Summ. J. at 4 (incorporating arguments from Plaintiffs' brief in opposition to Daystar Defendants' Motion for Summary Judgment on the issue of tolling).
[175] *Id.*

57

2008, his knowledge and actions must be imputed to the WHCA, given his then-capacity as the sole member of the governing Council.

The Court disagrees. The relationship between the Condominium owners and Mr. Sills and his various entities created or used for the project was not a harmonious one with clear lines of communication and a commonality of interest. In fact, the Court believes it is likely the evidence will show that Mr. Sills attempted to hide any potential defects he had been alerted to and to minimize those concerns to the unit owners. To find that Mr. Sills' knowledge was shared or imputed to the owners would simply be wrong.

Like the Court's earlier findings, it has determined that the statute was tolled until August of 2014 and thus AC's statute of limitations argument must fail.

### 3. *Causation*

Finally, AC argues it is entitled to summary judgment because there is no evidence that any breach of a duty owed by AC *caused* the alleged defective installation of the masonry façade.

To prove negligence, Plaintiffs must establish duty, breach, causation, and harm.[176] With regard to causation, Delaware recognizes "the traditional 'but for' definition of proximate cause."[177] An act or occurrence is a "proximate cause" if

---

[176]*See, e.g.*, *Jones v. Crawford*, 1 A.3d 299, 302 (Del. 2010).
[177] *See id.* (citing *Wilm. Country Club v. Cowee,* 747 A.2d 1087, 1097 (Del. 2000)).

it, "'in natural and continuous sequence, *unbroken by any efficient intervening cause,* produces the injury and without which the result would not have occurred.'"[178] An intervening act will not automatically break the continuous sequence of events. However, if the act "was not reasonably foreseeable, the intervening act supersedes and becomes the sole proximate cause of the plaintiff's injuries, thus relieving the original tortfeasor of liability."[179]

An architect is obligated "to perform with reasonable care the duties for which he [or she] contracts."[180] Here, AC agreed to provide Daystar "a complete, coordinated, set of Architectural Construction Documents, suitable for use in gaining approvals, your use in obtaining sub-contractor bids, acquiring permits, and executing construction."[181] AC also agreed to provide "Construction Administration Services" upon request. The record reflects that AC, albeit reluctantly, revised its plans to incorporate thin brick at Daystar's request. The revised plans, dated June 13, 2007, were submitted and approved by city building code officials in July 2007. According to Plaintiffs, the plans failed to include sufficient details regarding weather-resistant cladding, proper flashing, and weep measures.

---

[178] *See Duphily v. Delaware Elec. Co-op., Inc*., 662 A.2d 821, 829 (Del. 1995) (quoting *Culver*, 588 A.2d at 1097) (emphasis in original).
[179] *See id.*
[180] *See Seiler*, 367 A.2d at 1007 (quoting *Bloomsburg Mills, Inc. v. Sordoni Constr. Co.*, 164 A.2d 201, 203 (Pa. 1960)).
[181] AC's Mot. for Summ. J., Exhibit A.

AC's "lack of causation" argument is essentially that, even if its plans were negligently drafted as Plaintiffs suggest, the undisputed evidence establishes that ESW did not rely on anything provided by AC in installing the thin-brick and masonry veneer.[182] In particular, AC cites the testimony of ESW representatives that the installation was accomplished using ESW's *own* internal installation instructions, specifications, and experience.[183]

There is no dispute ESW was negligent in installing the Condominium's thin-brick exterior. However, "there may be more than one proximate cause of an injury."[184] Although AC would have the Court believe that ESW never so much as reviewed AC's plans, the ESW-Daystar Subcontract indicates otherwise. The Subcontract incorporated by reference certain "Contract Documents," including AC's architectural drawings.[185] ESW represented that it carefully examined and "fully understood" all "Contract Documents."[186] ESW agreed to "fulfill and follow the Contract Documents strictly"[187] and warranted "to the owner, Contractor, and architect" that its work would "conform to the requirements of the Contract

---

[182] AC Mot. for Summ. J at 31; Hearing Tr. (Jan. 18, 2017) at 104:18-23.

[183] AC's Mot. for Summ. J., Ex. N at 230-31, 263-64.

[184] *See Jones*, 1 A.3d at 302 (quoting *Culver*, 588 A.2d at 1097).

[185] AC's Mot. for Summ. J., Ex. O at Art. II, Art. XIX. The Subcontract also incorporated a document entitled "Daystar Sills, Inc. Specifications, Quality Requirements, and Scopes for Stone and Thin Brick." *Id*.

[186] *Id*. at Art. I.

[187] *Id*. at Art II.

Documents."[188] Moreover, the experts retained in connection with this litigation appear to agree that AC's plans contained inconsistencies and omitted key details regarding weather-resistant exterior cladding, proper flashing, weep measures, etc.[189] If proven AC was negligent in omitting this information and that, without such details, the risk that ESW would improperly install the exterior veneer was foreseeable.

Issues of causation are rarely suitable for summary disposition.[190] There are inconsistencies in the record regarding the role of AC's plans in the construction of the Condominium and the extent to which intervening causes may have impacted their potential liability. While the Court would certainly think the conduct of Daystar and ESW would reflect greater culpability and may be shown to have superseded AC's role in this mess, given the fact that AC apparently warned Daystar against the flawed design, it is an issue for the jury to determine. Thus, the extent to which AC's conduct caused Plaintiffs' damages cannot be resolved by summary judgment and the Motion is denied.

---

[188] *Id*. at Art. V (emphasis added). *See also id*. at Art III (agreeing ESW's work would "meet the drawings, specifications, Subcontract and other Contract Documents"). ESW ultimately subcontracted out the task of installing the veneer. Nevertheless, ESW warranted in its Subcontract with Daystar that "[a]ll subcontracted work [would] be performed in accordance with the Contract Documents." *See id.* at Art. XIII ("This Subcontract shall be incorporated into all tier subcontracts.").
[189] Pls.' Exs. 1006-1010.
[190] *See, e.g.*, *Perez-Melchor v. Balakhani*, 2006 WL 3055852, at *5 (Del. Super. Ct. Oct. 26, 2006).

## III. MOTION TO AMEND CROSSCLAIM

WHP has also moved for leave to file an Amended Crossclaim pursuant to Superior Court Civil Rule 15.  The decision to permit or deny an amendment is left to the discretion of the trial judge.  In exercising that discretion, the Court will "weigh[] the desirability of ending the litigation on its merits against possible prejudice or surprise to the other side."[191]

As is, WHP's Crossclaim, filed in conjunction with its Answer to Plaintiffs' Complaint on April 20, 2015, seeks "indemnification and/or contribution" against AC, Avalon, and ESW.  WHP's proposed amendment would add an additional basis for indemnification against ESW based upon contract, rather than tort. Specifically, WHP relies on the ESW Subcontract. According to WHP, "[t]hrough discovery, it became clear that the contract between Daystar…and ESW included a clause, which requires ESW to 'indemnify and hold harmless, the owner…' i.e. WHP, from and against all claims, damages, lawsuits, losses and expenses…."[192] The contract between Daystar and ESW also apparently required ESW to name WHP as an additional insured on its Commercial General, Business Automobile and Professional Liability insurance policy.

---

[191] *See Vichi*, 85 A.3d at 759 (internal quotation marks omitted).
[192]WHP's Mot. to Amend ¶ 3, Ex. 2 at Art. VII.

ESW opposes the Motion, contending: (1) WHP's proposed Amended Crossclaim is subject to *res judicata* based on the ESW-Daystar Arbitration; (2) ESW was dismissed from this litigation, per the Court's October 28, 2015 decision, such that there is no direct claim by Plaintiffs against ESW and WHP's Crossclaim is procedurally defective; (3) WHP knew of the subcontract upon which it seeks amendment for several years prior to filing its Motion and ESW would be prejudiced by the amendment; and (4) the contractual indemnification claim WHP seeks to include has not been "tried by express or implied consent of the parties."

This Court has already rejected the first two contentions ESW advances here, as detailed further in its decision denying ESW's Motion to Dismiss Crossclaims. In sum, the Court finds no merit in ESW's *res judicata* argument or in its position on the procedural appropriateness of the Crossclaims.[193] While the Court finds it highly doubtful that WHP just recently became aware of the Subcontract language it relies upon here, it does not see how ESW would be prejudiced by the amendment sought. ESW was a party to the Subcontract and it knew of the provisions contained therein. Letters supplied by counsel indicate that ESW was aware, since May 2016, that WHP intended to pursue indemnification under the language of the Subcontract.[194]

---

[193] *See supra* Section II.
[194] WHP's Mot. to Amend Crosscl., Exs. 3-4.

Finally, as for the issue of consent, the Court finds subsection (b) of Rule 15 simply is not applicable. That section does not apply to pretrial amendments but relates to confirming the pleadings to the evidence presented at trial. The request here is controlled by Rule 15(a) which reflects such motions should be freely granted when the interest of justice requires. Given the culpability of ESW in the construction deficiencies alleged in this matter, the Court finds fairness requires allowing the amendment to occur. As such, WHP's Motion to Amend Crossclaim is GRANTED.

## IV.   CONCLUSION

This decision resolves all outstanding Motions in this litigation. Trial is set to begin on November 8, 2017 with jury selection on November 2, 2017. The Court suggests that the parties reengage with the mediator previously used to determine whether settlement is now appropriate.

**IT IS SO ORDERED.**

 /s/ William C. Carpenter, Jr.
Judge William C. Carpenter, Jr.